UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALPVEX, INC.

                            Plaintiff

        -v-                                     1:17-CV-388

JOHN SWAN LTD.; KARL SWAN, individually,
as Managing Member of Acia, LLC, and as
Shareholder of John Swan Ltd.; GRAEME
McDOWELL, individually, and as Member of
Acia, LLC; and BARRY McLEAN, individually,
and as Member of Acia, LLC,

                            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

COFFEY & ASSOCIATES                     GREGORY J. COFFEY, ESQ.
Attorneys for Plaintiff
310 South Street
Morristown, New Jersey 07960

LAW OFFICE OF BRANDON J. ISAACSON PLLC   BRANDON ISAACSON, ESQ.
Attorneys for Karl Swan and John Swan Ltd.
200 Vesey Street, 24th Floor
New York, New York 10281

BAIRD LAW, PLLC                         EDWARD BAIRD, ESQ.
Attorneys for Graeme McDowell
1104 Solana Avenue
Winter Park, Florida 32789

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I.      INTRODUCTION

        In 2014, three parties came together to form Acia, LLC ("Acia").  The first of these was

defendant Karl Swan ("Swan").  This defendant is the director of defendant John Swan Ltd.

("JSL" or "the company"), a clothing corporation under the laws of the Republic of Ireland. The second party was defendant Graeme McDowell ("McDowell"). He is a professional golfer, most famous for winning the U.S. Open tournament in 2010. The third party was plaintiff Alpvex, Inc. ("Alpvex" or "plaintiff"). Plaintiff is a corporation under the laws of New Jersey that joined the Acia joint venture as an investor. Plaintiff's role was to fund the distribution of the golfer's licensed apparel in the United States.

That investment never panned out as the parties hoped, and now they stand before this Court to determine who—if anyone—should be liable for its failure. As such, Alpvex initiated the suit, asserting nine claims: (1) common law fraud; (2) fraud in the inducement; (3) fraudulent conveyance; (4) conversion; (5) bad faith; (6) breach of fiduciary duty; (7) breach of contract; (8) unjust enrichment; and (9) civil conspiracy. Plaintiff relied for jurisdiction before this Court on 28 U.S.C. § 1332, or diversity jurisdiction.[1]

Swan has asserted a cross-claim against Acia for breach of contract, account stated, and breach of operating agreement/indemnification. Although Acia has been removed from this case, those claims remain. McDowell has asserted a counterclaim against plaintiff for contribution and unjust enrichment. Plaintiff has moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56 against only JSL and Swan, and only on its claims of fraud in the inducement and breach of fiduciary duty. Those same two defendants have also moved for summary judgment under Rule 56 on all claims.[2]

---

[1] Originally Acia was a defendant in this case. Of course, for the purposes of determining citizenship, a limited liability company has the citizenship of each of its members, and because plaintiff and all defendants are members of Acia, there could be no diverse citizenship if Acia were a party. *See Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012). The claims against Acia were thus removed in plaintiff's Amended Complaint. Dkt. 32.

[2] Curiously, defendant Barry McLean ("McLean"), the erstwhile financial controller for JSL, has been served, and has participated in this action by submitting a declaration in support of Swan and JSL's motion for summary judgment, but has otherwise failed to appear and has made no motion for summary judgment of his own. Dkt. 49; Dkt. 101-14, ¶¶ 2-3. Given plaintiff's extended failure to attain an entry of default, this Court would require a powerful showing to grant default judgment in plaintiff's favor.

## II. BACKGROUND

### A. BEFORE ACIA.

In 1947, JSL was incorporated in the Republic of Ireland and began distributing clothing in that country under the brand name Kartel. Dkt. 100-12 ("Swan Dep.") p. 6, 11.[3] Initially, it distributed corporate clothing and casual apparel, but in 1996 it branched out to begin distributing golf apparel. *Id.* at 6. As part of its golf business, it negotiated a sponsorship agreement with the Irish professional golfer Padraig Harrington. *Id.* at 6-7.

Through that contact, Swan received a call in 2010 from McDowell's management seeking to purchase clothing for the golfer. Swan Dep. 7-8. In 2011, JSL turned that arrangement into a sponsorship agreement such that the company would market and sell the same clothes that it made especially for the golfer, in exchange for which the golfer would receive a royalty. *Id.* at 8, 12. The golfer thus began to wear and display attire made by the company and bearing the Kartel brand, called "G-Mac by Kartel" after the golfer's nickname. *Id.* at 9. This brand launched in 2012. *Id.* at 13.

In late 2011 or 2012, to help expand into the United States market, JSL incorporated Kartel, Inc., a wholly-owned subsidiary, in the United States. *See* Swan Dep. 11; Dkt. 101-3 ("Swan Dec."), ¶ 4. The subsidiary built its parent's enterprise by establishing brokers for customs, warehousing, distribution, and sales in this country. *Id.* ¶ 5.

### B. SEEKING INVESTMENTS.

In 2013, a tight Irish economy, declining sales and long lead times in collecting money from customers all began to take their toll on Kartel, Inc. and JSL. Swan Dep. 26. Thus, in the hopes of growing the United States business, Swan began to look for investors. *Id.* at 24. During a golf outing in October of 2013, Alan Swan, that defendant's father, met Brian

---

[3] Pagination corresponds with CM/ECF.

McGovern, a director of Alpvex. Dkt. 100-3 ("McGovern Dec."), ¶ 1; Dkt. 101-33 ("McGovern Dep."), p. 15. The elder Swan was wearing a G-Mac by Kartel shirt. McGovern Dep. 16.

McGovern was impressed by the shirt and the two began to discuss it and the clothing line. McGovern Dep. 16. In the course of the conversation, the elder Swan mentioned that he was in the United States looking for investors in the company, or else to start a new company to better market the apparel here. *Id.* McGovern volunteered to invest. *See id.* "[V]ery quickly" after McGovern met his father, defendant Swan sent him an investment proposal. Swan Dep. 30. Ultimately, the parties decided to form a new joint venture. Swan Dep. 17-18. This new entity would take over Kartel, Inc.'s business after a "brief overlap period." *Id.* By January 15, 2014, the parties had prepared and revised a "non-binding term sheet" for the joint venture that would eventually become Acia. *See generally* Dkt. 101-5.

On January 17, 2014, Swan asked McGovern to quickly draw the new entity down to help "accelerate deliveries and sales." Dkt. 101-37, p. 4. McGovern responded that he understood "how funding fashion lines for seasons can be a hit to working capital . . . ." *Id.* at 3. However, he also told this defendant that because "no legal entity yet exist[ed] for the [joint venture]", a quick draw-down would not be possible, but instead Alpvex would provide a short-term loan to Kartel Ltd. in Ireland. *Id.* On January 24, 2014, plaintiff provided that loan in the amount of $150,000, but to Kartel, Inc. instead.[4] Dkt. 101-36, pp. 1-2.

On February 4, 2014, the parties filed a Certificate of Formation in Delaware creating Acia as a limited liability company. Dkt. 100-5, p. 7. Negotiations would continue, however, until March 31, 2014, when at last the three foundational parties—this defendant, Alpvex, and McDowell—finalized the operating agreement that created Acia. *Id.* at 2.

---

[4] Acia repaid this loan with interest on April 29, 2014. Dkt. 101-36, p. 1.

Alpvex contributed $682,500 to Acia, in exchange for a 35% share in its profits going forward. Dkt. 100-5, p. 54. Though Swan testified at his deposition that he believed this capital contribution went into JSL's bank account, contemporaneous bank statements show the money being instead deposited directly into a dedicated Acia bank account. *Compare* Swan Dep. 38 (this defendant testifying that to his recollection, the capital contribution deposit would have been transferred to JSL's bank account), *with* Dkt. 100-9, p. 1 (showing wire transfer of $682,500 from plaintiff into Acia's entity bank account on April 22, 2014).

Swan and McDowell both contributed no money to the enterprise, but each received a profit share of 45% and 20% respectively. Dkt. 100-5, p. 54. The logic behind this was that the golfer would bring his name recognition, which merited his share of the profits. Swan Dep. 35. Similarly, the other defendant brought the value of the Kartel brand and the infrastructure to distribute it as his share of the investment. *Id.*

Each member of the ACIA operating agreement was shielded from liability for any action that they undertook for the company in good faith that did not constitute "fraud, gross negligence, or reckless or intentional misconduct[.]" Dkt. 100-5, p. 22. Moreover, the operating agreement stated that "no Member shall be entitled to the return of any part of its Capital Contribution" and that "no Member shall have any personal liability for the return of the Capital Contribution of any other Member[.]" *Id.* at 9.

Included with the operating agreement was a proposed budget. Dkt. 100-5, p. 56. That budget contemplated that $75,000 in expenses would have accumulated in January of 2014. *Id.* Similarly, the budget reflects that Acia expected to incur further costs—but also profits—starting in April of 2014. *Id.*

The same day that the operating agreement took effect, JSL, McDowell, and Acia entered into a supply agreement. Dkt. 101-6, p. 1. By the terms of that agreement, the

company was to allow Acia to assume the same production methods that it employed itself. *Id.* at 4. In the event of a shortfall in product, Acia was to be allowed to purchase G-Mac by Kartel branded goods from the company at cost. *Id.*

It is worth noting at this point that, from design to production to shipping, new lines of clothes take approximately six months to produce. Swan Dep. 12. Each new season of clothing demands this same six-month lead time. *Id.* New orders of clothes are manufactured, then invoiced, and finally, once the invoices are paid, shipped. *Id.* at 12-13. Thus, any clothing company expecting immediate profits upon formation would also need to expect a great deal of groundwork to be laid out well in advance.

## C. **FALLOUT.**

Acia struggled financially not long after its birth. On December 22, 2014, Alpvex provided an additional $50,000 to keep the business going. Dkt. 100-6, p. 1. This contribution also proved insufficient, and on March 23, 2015, plaintiff provided another $50,000. *Id.* McDowell also invested $50,000 on each of these two dates to keep Acia afloat. *Id.* On November 8, 2016, plaintiff provided yet another $50,000 in the form of a short-term loan to Acia. McGovern Dec. ¶ 29.

In late 2016, McGovern began to grow concerned as to where the money that Alpvex had been contributing to Acia was going. McGovern Dep. 25-26. Thus, on January 27, 2017, plaintiff's attorney sent Swan a letter requesting that the latter furnish invoices for the expenses that the loan was used to pay. Dkt. 101-36, pp. 1-2. In particular, the letter expressed concern "that [the loaned] funds were used to satisfy outstanding liabilities of Kartel, Inc., [JSL], or [this defendant], individually, and not liabilities of Acia . . . ." *Id.* Similarly, on February 28, 2017, plaintiff requested a further accounting of all invoices concerning Acia. Dkt. 101-10, p. 1.

On April 3, 2017, defendant McLean, a JSL employee involved in finances and accounting, provided a list of invoices paid by Kartel, Inc. and the company during early 2014 that it argues were for Acia's benefit. *See generally* Dkt. 101-9. The accounting began with the booth rental at the 2014 Professional Golfer's Association Merchandise Show taking place on January 22-24, 2014, for which Kartel, Inc. received an invoice on August 2, 2013. *Id.* at 3. Kartel, Inc., being the operating wing of the company in the United States until Acia became operational, was the named customer in these invoices. *See generally* Swan Dep. 41-50.

The remaining expenses all accumulated between January and April of 2014. Dkt. 101-9, pp. 4-28. The expenses included textile shipments, consultations, photo shoots, meals, travel, and other costs related to the production, importation, advertising, and storage of clothes. *Id.* at 3-28. Alpvex alleges that there was an additional invoice for Phoenix Software dated January of 2013 in the amount of $3,979.36. McGovern Dep. 65. However, McGovern admitted during his deposition that this invoice was not among the ones provided that totaled the $150,000 loan and agreed that the available bank statements do not reflect that total ever being paid. *Id.*

Apparently unsatisfied with defendants' response and the general condition of Acia, Alpvex initiated the present action on April 6, 2017. Dkt. 1. Plaintiff asserts nine claims under Delaware common law: (1) fraud; (2) fraud in the inducement; (3) fraudulent conveyance; (4) conversion; (5) bad faith; (6) breach of fiduciary duty; (7) breach of contract; (8) unjust enrichment; and (9) civil conspiracy. *See generally id.* Defendants Swan and JSL replied on June 28, 2017, and levied a cross-claim against Acia, then a co-defendant. Dkt. 8. On November 15, 2017, plaintiff submitted an amended complaint removing Acia as a

defendant.  Dkt. 32.  On July 10, 2018, McDowell answered and lodged a counterclaim against Alpvex.  Dkt. 53.

On August 12, 2019, Alpvex moved for partial summary judgment on its claims of fraud in the inducement against Swan and JSL ("the Swan defendants") and breach of fiduciary duty against the individual defendant.  Dkt. 100.  Those defendants responded with a motion for summary judgment against plaintiff on all claims.  Dkt. 101.  The motions having been fully briefed, this Court will consider them on the parties' submissions without oral argument.

## III.  **DISCUSSION**

### A.  **SUBJECT MATTER JURISDICTION.**

The Swan defendants first argue that this Court lacks subject matter jurisdiction over this claim because Acia is an indispensable party.  Because it is a limited liability company and has the citizenship of each of its members for the purposes of determining diversity jurisdiction, claims against it would destroy the requisite diversity.

#### 1.  **LEGAL STANDARD.**

Federal courts have jurisdiction under 28 U.S.C. § 1332 over disputes between "citizens of a State and citizens or subjects of a foreign state."  28 U.S.C. § 1332(a)(2).  Diversity jurisdiction is only proper "if diversity of citizenship among the parties is complete, *i.e.*, only if there is no plaintiff and no defendant who are citizens of the same State."  *OneWest Bank*, *N.A. v. Melina*, 827 F.3d 214, 217-18 (2d Cir. 2016).  By extension, "diversity jurisdiction cannot exist when aliens from the same state are on both sides of a case."  *Bank of N.Y. v. Bank of Am.*, 861 F. Supp. 225, 228 (S.D.N.Y. 1994).  A limited liability company takes the citizenship of each of its members.  *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt.*, 692 F.3d 42, 49 (2d Cir. 2012).

Under Rule 12(b)(7), a court may dismiss a complaint for plaintiff's failure to join a necessary party to the action under Rule 19. FED. R. CIV. P. 12(b)(7). However, "[b]efore dismissing a complaint under Rule 12(b)(7), a district court must determine whether the missing party" is truly necessary within the meaning of Rule 19. *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999) *abrogated on other grounds by United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1638 (2015).

In answering that question, the first step in the requisite three-step test is whether a missing party is necessary. *Viacom Int'l Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). If the party is truly necessary, the court must engage in the second step of determining whether joinder of the absent party is feasible. *Id.* at 725. Finally, if joinder is not feasible, the court must then conduct a Rule 19(b) analysis as to whether, in equity and good conscience, the action may proceed without the necessary party. *Id.* If the action may not proceed in good conscience, that party is indispensable to that claim and the claim must be dismissed. *See id.*

The relevant factors for whether a party is indispensable are: (1) the extent a judgment rendered in the person's absence might be prejudicial to the absent party or the parties already present; (2) the extent to which protective provisions in the judgment can lessen or avoid that prejudice; (3) whether a judgment rendered in the person's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. *See* FED. R. CIV. P. 19(b).

## 2. <u>**WHETHER ACIA IS A NECESSARY PARTY.**</u>

In a derivative suit brought in a limited liability company's name, that company is a necessary party under Rule 19. *Atanasio v. O'Neill*, 235 F. Supp. 3d 422, 425 (E.D.N.Y. 2017) . Moreover, because a limited liability company "is a separate legal entity with rights

and obligations distinct from those of its members; [a c]ourt cannot presume its interests are not also distinct from those of its members." *Bartfield v. Murphy*, 578 F. Supp. 2d 638, 650 (S.D.N.Y. 2008). As such, entities are generally considered indispensable parties for derivative suits brought to protect their interests. *See, e.g.*, *Atanasio*, 235 F. Supp. 3d at 425-26 (finding limited liability company necessary party to derivative suit and dismissing for lack of subject matter jurisdiction); *Bartfield*, 578 F. Supp. 2d at 650 (same); *Weber v. King*, 110 F. Supp. 2d 124, 127-29 (E.D.N.Y. 2000) (same).

In deciding whether a suit is derivative under Delaware law,[5] a court must "independently examine the nature of the wrong alleged and any potential relief to make its own determination of the suit's classification." *Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005, at *3 (Del. Ch. May 31, 2019). That determination is "based upon the body of the complaint; plaintiff's designation of the suit is not binding." *Id.* (internal footnote and citations omitted). Ultimately, the inquiry turns on the question of whether the cause of action comes from a plaintiff's own rights or the rights that they only have as a member of a discrete legal entity. *See Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1139 (Del. 2016).

Alpvex argues that its claims are brought on its own and are not derivative of Acia's rights and the duties defendants owe it. For plaintiff's fraud in the inducement claim, this is true. Its argument is that it only joined the Acia venture because of defendants' fraudulent conduct. Plaintiff's right not to be defrauded is its own and does not come because of its relationship to Acia. *See Citigroup*, 140 A.3d at 1139-40. On the contrary, by definition Acia had not yet been formed. Thus, this claim is properly labeled as direct. *Id.* Moreover,

---

[5] The parties both agree that Delaware law should apply in this case, and this Court agrees as well. The Operating Agreement asserts that the governing law of all claims arising from it, including tort claims, "shall be governed by, and construed in accordance with, the internal laws of Delaware, without reference to the choice of law principles thereof." Dkt. 100-5, p. 39. That said, this Court of course uses federal law to interpret procedural requirements. *Hogan v. Wal-Mart Stores, Inc.*, 167 F.3d 781, 783 (2d Cir. 1999) ("In matters of 'procedure,' however, federal law governs.").

because plaintiff's fraud in the inducement claim concerns the conduct of the individual defendants, Acia is neither a necessary nor an indispensable party.  *See Viacom*, 212 F.3d at 724-25.

Similarly, Alpvex's conspiracy claim is rooted largely in its fraud in the inducement claim, specifically alleging that defendants "acted and conspired jointly in a deliberate scheme to fraudulently induce [p]laintiff to invest" in Acia.  Dkt. 32 ¶¶ 119-20.  This claim is therefore also direct, and Acia is not necessary.

However, Alpvex's remaining claims are all derivative in nature.  According to the terms of the operating agreement, plaintiff's capital contributions were Acia's property, and it had no right to ever recover those capital contributions.  Dkt. 100-5, p. 9.  As a result, any claim relying on any defendant's use of those funds once they passed into Acia's hands is inherently derivative.

First, Alpvex's pure fraud claim relies entirely on defendants' use of the capital contribution for purposes "unrelated to and not associated with" Acia's operations and activities, and as such is a derivative claim.  Dkt. 32 ¶¶ 60-67.  Plaintiff effectively admits as much by stating that had it "been aware of [d]efendants' actions, [it] would have taken steps to *protect its ownership interest in*" Acia, illustrating that it was Acia's health and funding that is the central concern of this claim.  *Id.* ¶ 69 (emphasis added).  Plaintiff's fraud claim thus hinges on Acia's rights, and plaintiff can allege no wrong independent from the misuse of Acia's funds.  *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1038-39 (Del. 2004).  This claim is thus derivative, and Acia is a necessary party.  *See Atanasio*, 235 F. Supp. 3d at 425.

The same logic compels the same outcome for Alpvex's fraudulent conveyance, conversion, "bad faith," and unjust enrichment claims.  Each claim hinges entirely on alleged

abuses of the capital contribution after it became Acia's—and not plaintiff's—property.  *See* Dkt. 32, ¶¶ 85-90, 92-94, 97, 114-17.  The only harm that plaintiff can point to is harm to Acia, and thus these claims are derivative.  *Citigroup*, 140 A.3d at 1139.

Alpvex's breach of fiduciary duty claim is similarly derivative.  In the fiduciary duty context, the inquiry as to whether a claim is derivative or direct hinges on "the nature of the wrong and to whom the relief should go."  *Tooley*, 845 A.2d at 1038.  In other words, a direct claim "must be independent of any alleged injury to the corporation."  *Id.*  "The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[6]  *Id.* at 1039.  By plaintiff's own terms, defendants "owed a fiduciary duty to [Acia]'s members and managers including" plaintiff, and therefore plaintiff's claimed right is entirely dependent on the duty owed to Acia, not to any duty owed to plaintiff individually.  Dkt. 32, ¶ 100; *Tooley*, 845 A.2d at 1038-39.

However, Alpvex's breach of contract claim presents a closer question.  After all, an operating agreement that forms a legal entity can create rights both for its signatories and the company.  *Stone*, 2019 WL 2374005, at *3-4 (finding both direct and derivative basis for breach of contract claim for breach of operating agreement).  A direct claim for a breach of contract must be founded on rights specifically provided to a member by the organizing instrument.  *Cf. In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) (noting that a direct claim for breach of corporation's organizing instrument can exist "to enforce contract rights that stockholders possess").  Where, however, the allegedly breached right belongs to the company, rather than the plaintiff, that claim is derivative.  *See Stone*, 2019 WL 2374005, at *4 (finding breach of contract claim for failure to exercise right reserved to company is derivative).

---

[6] The direct and derivative suit framework is a direct import from corporate law, thus corporate rulings apply with equal force to limited liability companies.  *Stone*, 2019 WL 2374005, at *4 n.38.

Alpvex's claim again turns on its capital contributions to Acia, and therefore it ceded any right to that money by the terms of the very contract that it claims was breached.  Dkt. 32 ¶¶ 110-11.  Plaintiff's breach of contract claim amounts to an allegation that these defendants breached their contract with Acia to use its funds properly, thereby wasting the capital contribution that plaintiff gave to the joint venture.  This claim is therefore also derivative.[7]

All told, Alpvex's claims of fraud in the inducement and civil conspiracy are direct claims, and for these claims Acia is not a necessary party.  For plaintiff's claims of general fraud, fraudulent conveyance, conversion, bad faith, breach of fiduciary duty, breach of the operating agreement, and unjust enrichment, however, Acia is a necessary party.  The analysis thus turns to whether joinder is feasible, and, if not, whether Acia is indispensable.

### 3.  <u>WHETHER ACIA IS AN INDISPENSABLE PARTY.</u>

As an initial matter, Acia's joinder is not feasible.  Because it is a limited liability company, its citizenship is the same as its members.  This action being between and among Acia's members, any inclusion of Acia would destroy this Court's diversity jurisdiction, because Acia's citizenship will be the same as whichever party it would stand opposite.  *Bank of N.Y.*, 861 F. Supp. at 228.  Thus, Acia is a necessary party who cannot feasibly be joined.

The question must thus be whether Acia is so necessary to this action as to be indispensable.  From the outset, the consistency with which the courts of this Circuit have found that derivative suits cannot proceed without the entity whose right is at stake gives this Court pause.  *E.g.*, *Atanasio*, 235 F. Supp. 3d at 425-26; *Bartfield*, 578 F. Supp. 2d at 650; *Weber*, 110 F. Supp. 2d at 127-29.

---

[7] By contrast, defendant McDowell's counterclaim against plaintiff derives from a separate contract to which Acia, plaintiff, and that defendant are all parties.  Dkt. 53, ¶¶ 38-50.  That contract renders each of the three signatories jointly and severally liable for repayment of a loan taken for Acia.  *Id.* ¶ 39.  Thus, that defendant's right stems from that his personal payment toward a past due loan in Acia's favor, and thus belongs to him, not Acia.  That claim is thus not derivative and Acia is not necessary.  *Stone*, 2019 WL 2374005, at *3.

That said, the facts of this case further compel a finding that Acia is indispensable. McDowell also contributed capital to Acia, and assuming that Alpvex could establish its claim, the joint venture might have wanted to recover the entire capital contribution from these defendants, rather than only plaintiff's. Dkt. 100-6, p. 1. Otherwise, Acia could well find its interest already litigated and decided here without it being present. Moreover, that prejudice could be compounded by McDowell being held liable for *his own* capital contribution, that, as alleged, the other defendants abused. *Id.*

Moreover, the capital contribution is Acia's, not Alpvex's. Dkt. 100-5, p. 9. Plaintiff has no right or mechanism without Acia's presence of attaining property that its claims—if proven—would establish as Acia's property, and Acia's alone. *Id.* Essentially, allowing plaintiff to recover on these claims in this Court without Acia's presence would be rewriting the operating agreement such that plaintiff never ceded its right to a return of the capital contribution. *Id.* This Court would hesitate to do so under the best of circumstances, let alone where Acia, the party to the operating agreement whose rights would be most affected by such a revision, is not present and cannot protect its interests.

Therefore, the better path would be to simply require plaintiff to bring its derivative claims in New York state court, where the parties—including Acia—have all consented to jurisdiction. Dkt. 100-5, p. 39 (operating agreement pronouncing that all parties to the agreement "irrevocably submit[] to the co-exclusive jurisdiction of the federal *and state courts* located in New York" (emphasis added)). Alpvex would therefore have an adequate remedy if these claims were dismissed, unlike the less than adequate remedy of guessing at Acia's interests should the claims remain here.

Acia is thus an indispensable party for these claims, and this Court thus lacks diversity jurisdiction over them. The following seven counts of the amended complaint must therefore

be dismissed without prejudice against these defendants: (1) fraud; (3) fraudulent conveyance; (4) conversion; (5) bad faith; (6) breach of fiduciary duty; (7) breach of the operating agreement; and (8) unjust enrichment.[8] *Atanasio*, 235 F. Supp. 3d at 425-26.

Plaintiff has also alleged counts (1), (6) and (7) against the nonmoving defendants McDowell and McLean. Because this Court finds that these counts cannot proceed against the Swan defendants, having moved on those grounds, it also finds *sua sponte* that the same logic compels dismissal of those counts against the nonmoving defendants.

That Acia is indispensable touches on this Court's jurisdiction, and the Second Circuit has noted that even an appellate court is "obliged to consider" whether parties are indispensable, despite a failure of the parties to object on that score. *Manning v. Energy Conversion Devices, Inc.*, 13 F.3d 606, 608-09 (2d Cir. 1994). Alpvex was given notice of this potential defect in its pleadings and failed to provide any evidence or arguments to counsel against dismissal of this claim. As such, all of plaintiff's claims that are derivative in nature must be dismissed without prejudice as to each defendant.[9] *See, e.g.*, *Rubler v. Unum Provident Corp.*, 2007 WL 188024, at *2-4 (S.D.N.Y. Jan. 25, 2007) (dismissing complaint for nonjoinder of an indispensable party *sua sponte*); *Gilmore v. Stone*, 2003 WL 1923734, at *1, 6 (N.D.N.Y. Apr. 23, 2003) (dismissing complaint *sua sponte* for failure to join unserved defendants).

---

[8] To the extent that defendants also argue that plaintiff lacks standing to bring its derivative claims, that argument need not be considered because this Court lacks jurisdiction over those claims under any circumstance.

[9] Though Alpvex has not requested it, this Court additionally notes that it cannot maintain supplemental jurisdiction over these claims because it would have to join Acia as a party under Rule 19, which it is prohibited from doing because that would be inconsistent with the jurisdictional requirements of § 1332. *See* 28 U.S.C. § 1367(b) (noting that courts "shall not have supplemental jurisdiction . . . over claims by plaintiffs against persons made parties under Rule . . . 19 . . . when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of [§] 1332").

## B. <u>FRAUD IN THE INDUCEMENT.</u>

Both Alpvex and the Swan defendants have also moved for summary judgment under Rule 56 for plaintiff's claims of fraud in the inducement and breach of fiduciary duty. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the party's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

To state a claim for fraud in the inducement, a plaintiff must allege five elements: (1) a false representation of material fact; (2) defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) plaintiff's

reliance resulted in damages.  *Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1022 (D. Del. 2011).

Alpvex's theory is that the entire Acia enterprise was an elaborate ruse crafted by Swan, McDowell, and their associates to lure in an investor.  That investor would provide money into the joint venture, which defendants would then use to pay off their back debts accrued through other enterprises such as Kartel, Inc.

Initially, it is worth noting that Alpvex argues that defendants' false representation came in the form of the omission and concealment of the relevant fact that they had no intention of actually conducting Acia's business.  Defendants respond that plaintiff has failed to show any evidence of an active concealment of facts and that defendants had no duty to disclose anything to plaintiff during arm's-length negotiations.  *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015) (noting that "[i]n an arms' length contractual setting . . . a party has no affirmative duty to speak").

Alpvex's characterization of its theory of its case is wrong.  By seeking investors and entering into the joint venture negotiations and the eventual actual agreement to create Acia, the Swan defendants actively represented that they were seeking to create the enterprise. That is an affirmative misrepresentation, not an omission, and plaintiff's decision to color this misrepresentation otherwise—despite its making plaintiff's assertion of its claims more difficult—does not change the simple truth that plaintiff claims that defendants lied when they stated an intent to conduct Acia's business.[10]  *See Universal Am. Corp. v. Partners*

---

[10] To whatever extent plaintiff claims that the Swan defendants omitted the fact that they had debts for their operating expenses and that plaintiff relied on that omission, that argument is belied by the record.  McGovern was told in his email communications with Swan in January of 2014 that JSL needed money to "see [it] through the interim and keep things moving until [the Acia negotiations were] completed," and that those "funds would help . . . accelerate deliveries and sales." Dkt. 101-37, pp. 3-4.  Indeed, defendants only sought an investor because they found themselves short of funds.  Swan Dep. 24; McGovern Dep. 16.  Defendants did not therefore omit the fact that they had debts related to their operating expenses, and plaintiff entered negotiations fully aware of that fact.

*Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014) ("Every misrepresentation, to some extent, involves an omission of the truth, and [the plaintiff] cannot re-characterize every misrepresentation as an omission.").  Thus, plaintiff need not prove a duty to disclose nor an act of concealment.

However, Alpvex has failed to provide sufficient evidence to survive summary judgment that the Swan defendants lied when they approached plaintiff looking to begin the joint venture.  Plaintiff's evidence amounts to:  (1) Swan's admission during his deposition that the initial capital contribution for Acia was deposited into JSL's bank account; (2) that there is no assumption of liabilities clause in the operating agreement; (3) that when asked to account for how Acia's money was being spent, defendants provided invoices to debts that predated Acia's formation; (4) that the customer in those same invoices was Kartel, Inc., and not Acia; and (5) that defendants repaid an unrelated loan from plaintiff with plaintiff's own money.

The Swan defendants, for their part, argue that:  (1) Swan was mistaken when he testified that the Acia capital contribution was placed into JSL's bank account; (2) although there is no assumption of liabilities clause in the operating agreement, defendants were authorized to accumulate expenses and charge them to Acia under the supply agreement; (3) those invoices were accumulated to ensure that Acia would have stock to sell upon its formation; (4) the name on the invoices is irrelevant, because they arose in the course of Acia business; and (5) the loan was specifically to fund Acia.  Additionally, defendants argue that plaintiff knew what would be done with the loan and the capital contribution before making either, as indicated by the budget attached to the operating agreement that reflected losses in January and profits in April of 2014, despite Acia's remaining unformed until April.  Dkt. 101-6, p. 1.

Even assuming every disputed fact in Alpvex's favor, none of plaintiff's pieces of evidence advances their theory, nor do all together. Even if Acia's funds were initially comingled,[11] that does not allow for an inference that Swan and JSL never intended to carry out Acia's business. Swan Dep. 38. It may indicate an improper degree of control over funds that were intended to belong to Acia, but it would require quite a leap of logic from that improper control to land on the idea that the entire Acia entity was conceived in fraud.

Alpvex's arguments that Acia's operating agreement contained no assumption of liabilities clause are similarly unavailing. The evidence overwhelmingly demonstrates that all parties to the contract understood that for Acia to immediately turn a profit, preliminary expenses would need to accrue well ahead of its formation. Dkt. 101-37, p. 3 (McGovern stating over email that he understood "how funding fashion lines for seasons can be a hit to working capital"); Swan Dep. 12-13 (describing the long lead times required to produce stock for clothing sales). That evidence similarly speaks plainly that the parties to the contract all anticipated that these expenses would accrue, because the budget prepared and attached to Acia's operating agreement included losses from January and anticipated profits in April of 2014. Dkt. 100-5, p. 56.

Thus, although it is true that there is no clause in the operating agreement by which Acia would agree to take on the debt for these pre-formation expenses, the mere payment of these expenses does not evince an intention on the Swan defendants' part to not actually carry out Acia's business. Plaintiff has provided no evidence that defendants never sold product through Acia. The record is furthermore silent as to any communication evincing

---

[11] This Court notes, however, that notwithstanding Swan's testimony that the Acia capital contribution was originally transferred into JSL's bank account, plaintiff's own submissions demonstrate that plaintiff wired the capital contribution directly into Acia's bank account. *Compare* Swan Dep. 38 (this defendant's testifying that the capital contribution was deposited in the company's account), *with* Dkt. 100-9, p. 1 (showing the actual wire transfer of plaintiff's money directly into Acia's bank account).

defendants' intention not to operate the joint venture. In light of that silence, plaintiff has failed to carry its burden after discovery.

Neither do Alpvex's varied allegations concerning the invoices repaid using its $150,000 loan create any triable question of fact. Far from the "old debts" that plaintiff alleges, the invoices were entirely for expenses in line with Kartel, Inc.'s business, which Acia was to assume not long after it was formed. Swan Dep. 17-18; Dkt. 101-9, pp. 3-28.

Moreover, the invoices accumulated entirely between January and April of 2014, the timeframe during which the Swan defendants anticipated that the investment in Acia would follow, but before Acia was fully operational. Dkt. 101-9, pp. 3-28. The expenses plaintiff complains of all went toward the publicity of the G-Mac by Kartel brand or to produce wares for Acia to sell upon formation. *Id.* In short, even assuming that the Swan defendants did not have a right to incur these expenses for Acia prior to its formation, the record is emphatic that they were attempting to conduct Acia's business, rather than simply using Acia as a vehicle to discharge their debts. Thus, plaintiff has failed to establish that the Swan defendants misrepresented their intent to operate Acia.

Finally, Alpvex's arguments concerning the loan are irrelevant. If plaintiff's theory is believed,[12] and the loan was unrelated to Acia, the Swan defendants were free to use that money however they chose. McGovern Dep. 25-26. They chose to use it to purchase wares for Kartel, Inc. and to otherwise publicize the brand. Dkt. 101-9, pp. 3-28. They then repaid

---

[12] Plaintiff argues—and McGovern testified at his deposition—that this loan was entirely unrelated to the Acia venture and was a separate loan for plaintiff to make money. McGovern Dep. 24-25. This contention is dubious, to say the least. That plaintiff would provide a completely unrelated short-term loan to a company actively seeking investment because of a cash-flow shortage strains belief. Moreover, the letter demanding the invoices paid using the loan plainly states that plaintiff was "concerned that those funds were used to satisfy outstanding liabilities of Kartel, Inc., [JSL] or [Swan] *and not liabilities of Acia* . . . ." Dkt. 101-36, p. 1. If plaintiff did not intend the loan to relate to the Acia enterprise, whether it was related to Acia's expenses would not matter, because it would be improper for the loan to be repaid by Acia regardless of whether it was used for Acia-related expenses. Furthermore, the emails requesting the loan state that the loan was to see these defendants "through the interim" until Acia's funding was completed, reinforcing the notion that the loan was to support these defendants until Acia's funding could be finalized. Dkt. 101-37 p. 3.

that loan out of Acia's funds, which may have been procedurally improper if the validity of plaintiff's theory is assumed, but it does not establish by any stretch of the imagination that this meant that Acia was formed solely to discharge those debts.

Quite the contrary. Had these expenses not been paid, Acia would have had no stock and would have needed to purchase that stock from JSL at cost, in which case they would have needed to repay all of the invoices that the loan was used for except perhaps the 2014 Professional Golfer's Association and Phoenix Software invoices.[13] *Id.*

True, these defendants paid the loan directly from Acia's funds instead of paying JSL the cost of the items necessary to produce the stock first. But their skipping the step of paying from Acia to the company so that the company could repay its own debt and instead repaying plaintiff directly from Acia in no way supports the allegation that these defendants lied about their intention to operate Acia at all.

In summary, unless Alpvex means to advance the argument that it expected that Acia would be entitled to a free warehouse full of stock to sell immediately upon formation, this record pronounces emphatically that the Swan defendants were trying to do precisely what they agreed to do: operate Acia out of the United States. Indeed, if these defendants had done what plaintiff seems to argue they should have done—nothing at all until after Acia was formed—the six months of costs to produce the clothing with no profits would have presented far more compelling evidence of fraud in the inducement than plaintiff's assembled showing.

Alpvex has, all told, failed to demonstrate that the Swan defendants made any misrepresentation of a material fact. They have similarly failed to demonstrate any omission of fact under a duty to disclose, or any efforts to conceal a material fact. Plaintiff has

---

[13] Assuming for the purposes of summary judgment that the Phoenix Software expense was actually paid—despite the absence of any physical evidence that it was—this one questionable payment alone is insufficient to provide any indication that defendants did not intend to carry on Acia's enterprise. McGovern Dep. 65.

therefore not proven even the first element of fraud in the inducement such that any reasonable factfinder could credit their claim.  This claim must thus be dismissed.

But even setting aside the extent to which Alpvex's theory of the case is unsupported, it has also provided not one whit of evidence that it believed that Acia would operate as it implausibly suggests, and therefore it has not proven reliance as a matter of law.

Alpvex claims that it relied on the Swan defendants' misrepresentations that they would use the capital contributions to conduct Acia business alone and only after Acia was formed.  Even assuming that defendants made that misrepresentation, plaintiff would still bear the burden at trial of proving that it relied upon that falsehood.  *Tani*, 811 F. Supp. 2d at 1022.  By every indication of the record evidence, however, plaintiff knew that there would by necessity be certain expenditures in advance of Acia's formation.  Dkt. 100-5, p. 56; Dkt. 101-37, p. 3; Swan Dep. 12-13.

Alpvex has if anything proven that it anticipated that all of these expenses would be necessary, and thus cannot prove that it relied on any misrepresentation that these expenditures would not arise.  Plaintiff has therefore failed to prove reliance as a matter of law, and for this reason as well, plaintiff's claim of fraud in the inducement must be dismissed with prejudice.

## C.  CIVIL CONSPIRACY.

Under Delaware law, the elements of a claim for civil conspiracy are:  (1) "an agreement, confederation[,] or combination of two or more persons[;]" (2) "an unlawful act in furtherance of the conspiracy[;]" and (3) "actual damage to the plaintiff."  *In re Verestar, Inc.*, 343 B.R. 444, 483 (S.D.N.Y. 2006) (citing *Everett v. Hosp. Billing & Collection Serv., Ltd.*, 2005 WL 751940, at *3 (D. Del. Mar. 31, 2005)).  Nowhere in the record has Alpvex supplied any evidence, circumstantial or direct, to suggest that the Swan defendants engaged in any

agreement or confederation to engage in any unlawful act, including fraud in the inducement. Indeed, as discussed above, plaintiff's claim for civil conspiracy relies on its claim of fraud in the inducement, and thus plaintiff's failure to prove that claim means it can point to no unlawful act either. Plaintiff's claim for civil conspiracy thus must also be dismissed with prejudice.

### D. THE SWAN DEFENDANTS' CROSS-CLAIM.

From the outset, it must be noted that because Acia is no longer a party to this action, defendant's cross-claim can no longer remain before this Court as a cross-claim. However, under Rule 14(a), a defendant can become a third-party plaintiff and assert claims against a third-party defendant not currently before the court. FED. R. CIV. P. 14(a). Claims by a third-party plaintiff who is a defendant in the initial case can be maintained against a non-diverse third-party defendant under supplemental jurisdiction through 28 U.S.C. § 1367(b) even where the third-party defendant's presence would destroy diversity. *Viacom*, 212 F.3d at 727.

"[F]ederal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to form part of the same case or controversy under Article III of the United States Constitution." *Briarpatch, Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (internal quotation marks omitted). In particular, "[f]ederal courts have exercised supplemental jurisdiction over claims for indemnification when these claims were tightly interwoven with federal law issues the lawsuit presents." *McLeod v. Llano*, 2019 WL 1129429, at *7 (E.D.N.Y. Mar. 12, 2019) (internal quotation marks omitted) (citing *Harris v. Rivera*, 921 F. Supp. 1058, 1062 (S.D.N.Y. 1995) (further citations omitted)).

This Court may, however, "decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . —judicial economy, convenience, fairness and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Swan has asserted a cross-claim against Acia for breach of contract, account stated, and indemnification. This defendant has not voluntarily dismissed that claim, nor has he moved under Rule 14(a) to bring a third-party claim against Acia. Nevertheless, for the sake of clarifying the remaining claims in this action, this Court will consider whether that claim should remain.

For the reasons discussed above, this Court cannot attain original diversity jurisdiction over any claim by a party in this case against Acia, therefore if this claim is to survive, it must be through supplemental jurisdiction.

Swan's breach of contract and account stated claims are entirely unrelated to Alpvex's original complaint, because they both allege the same failed payment from Acia to this defendant, which has no connection to the formation and operation of Acia. Dkt. 8, ¶¶ 9-19. Thus, these claims are not part of the same case or controversy as plaintiff's claims and must be dismissed. *Briarpatch*, 373 F.3d at 308. Additionally, although this Court could maintain this defendant's indemnification claim via supplemental jurisdiction, there is no need to do so, because there remain no active claims against this defendant. This defendant's cross-claim therefore must be dismissed without prejudice.

## IV.     <u>CONCLUSION</u>

It is safe to say that Acia did not work out as well as any party to this action would have liked.  Its ruins speak plainly on that score.  But it is just as safe to say that, at least insofar as the Swan defendants are concerned, nothing that happened in the course of its life amounted to fraud.  Instead, the record makes plain that Alpvex was searching for a way out of a bad investment and tried to find evidence of defendants' wrongdoing in the hopes of escape.  At least in terms of these defendants, that search was in vain.  Plaintiff's claims against Swan and JSL must therefore be dismissed.

Therefore, it is

ORDERED that

1.  Plaintiff's motion for summary judgment is DENIED;

2.  Defendants Swan and John Swan Ltd.'s motion for summary judgment is GRANTED;

3.  Plaintiff's claims of:  (1) fraud; (3) fraudulent conveyance; (4) conversion; (5) bad faith; (6) breach of fiduciary duty; (7) breach of contract; and (8) unjust enrichment are DISMISSED WITHOUT PREJUDICE AGAINST ALL DEFENDANTS;

4.  Plaintiff's claims of:  (2) fraud in the inducement; and (9) civil conspiracy are DISMISSED WITH PREJUDICE AGAINST DEFENDANTS SWAN AND JSL;

5.  Defendant Swan's cross-claim is DISMISSED WITHOUT PREJUDICE;

6.  Defendants Swan and John Swan Ltd. are dismissed from this action; and

7.  This Court defers judgment until plaintiff's remaining claims against the remaining defendants are resolved, as well as defendant McDowell's counterclaim.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated: November 26, 2019
Utica, New York.